## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | |
|---|---|
| KEVIN STEWART, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15-CV-191-RLW |
| | ) |
| NANCY A. BERRYHILL, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant.[1] | ) |
| | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying the application of Kevin Stewart ("Stewart") for

disability insurance benefits.

### I. Background

Stewart filed an application for Supplemental Security Income on October 2, 2012. The

Social Security Administration ("SSA") denied Stewart's application for benefits, and he filed a

timely request for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted

Stewart's request and a hearing was held on March 25, 2014. The ALJ issued a written decision

on May 1, 2014, upholding the denial of benefits. (Tr. 11-22). Stewart filed a timely Request for

Review of Hearing Decision with the Appeals Council. (Tr. 7). The Appeals Council denied

Stewart's Request for Review on September 2, 2015. (Tr. 1-3). The decision of the ALJ thus

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d)
of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be
taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security
Act, 42 U.S.C. § 405(g).

stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).
Arnold filed this appeal on May 8, 2015. (ECF No. 1). Stewart filed a Brief in Support of his
Complaint on February 1, 2016. (ECF No. 11). The Commissioner filed a Brief in Support of
the Answer on April 27, 2017. (ECF No. 16). Stewart filed a Reply Brief on May 11, 2016.
(ECF No. 17).

## II.     Decision of the ALJ

The ALJ found that Stewart had the following severe impairments: history of carpal
tunnel syndrome, arthritis/tendonitis of the right shoulder, mild degenerative disc disease of the
lumbar spine, anxiety and depression. (Tr. 13). The ALJ, however, determined that Stewart did
not have an impairment or combination of impairments that meets or medically equals the
severity of one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 13). The
ALJ found that Stewart had the residual functional capacity ("RFC") to perform light work,
except for the following nonexertional limitations that further limit his ability to perfect light
work: occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds;
occasionally stoop, kneel, crouch, and crawl; limited to frequent (not constant) reaching in all
directions with the right upper extremity; limited to frequent (not constant) handling and
fingering bilaterally; should avoid concentrated exposure to pulmonary irritants, unprotected
heights, excessive vibration, and hazardous machinery; and is limited to the performance of
unskilled work only. (Tr. 15). The ALJ found that Stewart was not able to perform any past
relevant work. (Tr. 20). The ALJ determined that, based on Stewart's RFC, jobs exist in
significant numbers in the national economy that he could perform. (Tr. 17). Consequently, the
ALJ found that Stewart was not disabled since September 18, 2012, the date the application was
filed. (Tr. 21).

2

### III.  Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A.  Hearing Testimony

Stewart testified on March 25, 2014, as follows:

Stewart is 49 years old. (Tr. 32). He completed 12th grade education. (Tr. 32). He lives alone in a camping trailer. (Tr. 32). He last worked on February 7, but that caused him to return to the hospital for 10 days because he could not walk afterwards. (Tr. 32). His most recent employment was construction work. (Tr. 33). In July 2012, Stewart fell off a ladder. (Tr. 33). Stewart had no reported income in 2006. (Tr. 33).

Stewart's back is the main reason he cannot work. (Tr. 33). The doctors say it is arthritis in his back that causes his pain. (Tr. 33). He also has some mild disc narrowing at L4-5 and L5-S1. (Tr. 34). Stewart also suffers from anxiety and panic attacks. (Tr. 34). He has been to the hospital several times for panic attacks. (Tr. 34). He is not receiving any mental health treatment from a mental health professional. (Tr. 34). He has problems with his right shoulder from his fall. (Tr. 34). The doctors want to do surgery but his insurance will not cover physical therapy so the doctors will not do the surgery. (Tr. 34-35). He has trouble sleeping. (Tr. 35). He takes hydrocodone and oxycodone for his pain; Xanax for anxiety and panic attacks. (Tr. 35). He obtains his medications through Medicaid and his mother pays the co-pays. (Tr. 35-36).

He pays his bills with help from his mother. (Tr. 35).

He smokes less than a pack a day. (Tr. 36). He watches TV and walks around a bit during the day. (Tr. 36). He does light housekeeping in his trailer and can fix himself something to eat. (Tr. 36). He has a driver's license but does not drive or have a vehicle. (Tr. 36). He can take care of his personal needs, including bathing and dressing. (Tr. 36).

He can walk about 15 or 20 minutes before he needs to sit on an average day. (Tr. 37). He can stand for 15 minutes on an average day. (Tr. 37). He can sit for 15 minutes before he must get up and stretch. (Tr. 37). He can lift around 20 pounds. (Tr. 37). His weighs around 216 pounds and is 6'1". (Tr. 37). His medications do not take away all of the pain and the Xanax does not take away all of the anxiety but they make it "bearable." (Tr. 37).

Stewart has carpal tunnel syndrome in both wrists but it is worst in his left wrist. (Tr. 38). He was prescribed wrist splints for both hands, but does not wear them because they do not help. (Tr. 39). Stewart's doctors recommended he receive the carpal tunnel release surgery but Stewart is too scared. (Tr. 39).

Stewart had cancer removed from his left arm. (Tr. 40). He continues to have pain in his left arm from the surgery. (Tr. 40). His right shoulder has continuously hurt since he fell off a ladder in 2011. (Tr. 40). He cannot afford the physical therapy so he takes hydrocodone and oxycodone to treat the pain. (Tr. 41).

He could not lift 20 pounds if he had to lift 20 pounds five days a week. (Tr. 42). He could lift a gallon of milk—around 8 pounds—every day. (Tr. 42). He has lost his ability to grasp objects because of his carpal tunnel syndrome. (Tr. 42). He drops things two or three times per week. (Tr. 43).

Laurel Campbell, M.D., a physician at Smith Street Clinic in Sikeston, Missouri, prescribed Xanax to Stewart. (Tr. 43). Dr. Campbell diagnosed Stewart with depression and anxiety. (Tr. 43). Stewart tried counseling about 7 years ago but it was not helpful. (Tr. 43). He has crying spells or emotional outbursts bi-weekly. (Tr. 43). Stewart has constant feelings of being overwhelmed. (Tr. 44). He gets very nervous in crowds. (Tr. 44). He leaves his trailer daily to visit his neighbor, who lives about 100 feet from him. (Tr. 44). He visits his mom, who

4

lives 4 miles away from him, on occasion. (Tr. 44). Other than his mom and his neighbor, Stewart does not like to be around people . (Tr. 45). He has gone to the hospital around 8 times over the last 4-5 years because of panic attacks. (Tr. 45-46). He has been taking Xanax for a year and a half. (Tr. 46).

Stewart has difficulty concentrating or staying focused. (Tr. 46). He can concentrate for 10-15 minutes before he gets distracted. (Tr. 46). He has poor short-term and long-term memory. (Tr. 46).

He has back pain in his lower back that radiates down his legs. (Tr. 47). Dr. Campbell prescribed a cane for Stewart to help his balance and with his back pain. (Tr. 47). He uses his cane every day. (Tr. 48).

The ALJ noted that Stewart's October 2012 MRI showed no tear on his right shoulder. (Tr. 48). Stewart, however, states that the doctor said there was a tear and wanted to do surgery. (Tr. 48-49).

Vocational expert Janice Haskert testified as follows:

The ALJ noted that Stewart's primary profession was as a commercial painter. (Tr. 49). He previously worked for CMK Building Materials as a delivery driver. (Tr. 50). This past work as a delivery driver is classified as medium, semi-skilled work. (Tr. 50).

Hypothetical number one assumes an individual of Stewart's age, education, and work experience, who is limited to only light exertion level work, can occasionally climb stairs and ramps, but never climbs ropes, ladders, and scaffolds, can occasionally stoop, kneel, crouch, and crawl, can reach in all directions but is limited to frequent—not constant—on the right; can reach overhead but is limited to occasionally on the right, handling and fingering is limited to frequent, not constant; individual should avoid concentrated exposure to pulmonary irritants, unprotected

5

heights, excessive vibration, hazardous material, and unskilled work only. Haskert testified that such an individual could perform a wide range of unskilled light occupations, including inserting machine operator, shipping/receiver weigher, and bakery conveyor worker. (Tr. 51).

Hypothetical number two assumes an individual of Stewart's age, education, work experience, who is limited to performing sedentary exertional level work, can occasionally climb stairs and ramps, but never climb ropes, ladders and scaffolds, occasionally stoop, kneel, crouch and crawl, can reach in all directions but is limited to frequent with the right upper extremity, can reach overhead but is limited to never with the right upper extremity; can handle and finger but is limited to frequent, not constant; must avoid concentrated exposure to pulmonary irritant, unprotected heights, excessive vibration, hazardous machinery; limited to performing unskilled work only, that requires no more than occasional contact with the public and coworkers; must avoid high production rate jobs (although medium and low production rate jobs would be acceptable). Vocational expert Haskert stated that jobs for individuals with these limitations are available, including egg processor, production checker, and eyeglass polisher. (Tr. 52).

Hypothetical number three assumes the same limitations as hypothetical number two. (Tr. 52). Hypothetical number three includes the added limitations that any job must allow for occasional unscheduled disruptions of both the workday and workweek, secondary to the necessity to sit or lie down for extended periods of time during the day; potential occasional to frequent periods of decomposition during the workday, and unreliability as far as showing up for work; and secondary symptoms or treatments. (Tr. 53). Vocational expert Haskert asserts that there are no possible jobs available for a person with those limitations. (Tr. 53).

Vocational expert Haskert testified that if the individual in hypothetical number one also required the use of a cane for ambulation and balance then no jobs would be available. (Tr. 53).

6

However, vocational expert Haskert testified that if the individual in hypothetical number two required the use of a cane for ambulation and balance, then jobs would still be available because ambulation is not required for sedentary jobs. (Tr. 54).

Vocational expert Haskert testified that if the individual in hypothetical number one was limited to reaching all directions on an occasional basis with the right upper extremity in addition to the other limitations, then the bakery conveyor position and the shipping and receiving weigher position would still be available. (Tr. 54-55). If a person could not lift more than five pounds, then that person would be excluded from all of the jobs cited. (Tr. 55-56). If an individual could only stand or walk for less than one hour throughout an eight-hour day and could sit less than one hour through an eight-hour day, then that person would not be able to perform any of the work cited. (Tr. 56).

## B. Medical Evaluations

Stewart's relevant medical evaluations are summarized as follows:

Stewart was seen at Missouri Delta Medical Center on April 4, 2011, where x-rays were taken of his lumber spine. (Tr. 283). The examination showed minimal joint space narrowing of L4-L5 and slightly of L5-S1. (Tr. 283). On May 5, 2011, Stewart was seen at the Southwest Primary Care at Mt. Auburn. (Tr. 243). Stewart was seen for mood disorder and reported it was very difficult to meet home, work, or social obligations. (Tr. 243). Stewart reported that the precipitating factor for his depression was his "divorce nearly 6 years ago." (Tr. 243). He was negative for bone/joint symptoms and weakness. (Tr. 244). He was diagnosed with a mood disorder, and his prescriptions for Zyprexa and Celexa were refilled. (Tr. 244).

On June 13, 2011, Stewart went to Southeast Internal Medicine regarding his back pain and hand numbness. (Tr. 246). Stewart was diagnosed with low back pain radiating to both legs

and carpal tunnel syndrome on both sides. (Tr. 247). On July 7, 2011, Stewart was seen at Southeast Internal Medicine for mood disorder and carpal tunnel pain and numbness. (Tr. 252). Stewart had a joint injection to his wrists and was prescribed braces to wear at night. (Tr. 253). On September 16, 2011, Stewart was seen at Southeast Internal Medicine for carpal tunnel pain. (Tr. 256). He reported that his condition had improved with a brace and bilateral steroid shot. (Tr. 256). Stewart was sent for an EMG and to discuss surgery. (Tr. 257). On October 5, 2011, Stewart was seen at Southeast Internal Medicine with complaints of bilateral wrist pain. (Tr. 259). The EMG showed the carpal tunnel on Stewart's left wrist was worse than his right wrist. (Tr. 260). Stewart was told to use the brace and possible carpal tunnel release. (Tr. 260).

On October 18, 2011, Stewart was seen at the Emergency Room with complaints of carpal tunnel syndrome but the doctor noted no neck or back issues. (Tr. 286-87).

On December 12, 2011, Plaintiff was seen at the Missouri Delta Medical Center and the physician noted no musculoskeletal pain, instability or stiffness. (Tr. 262).

On December 13, 2011, Stewart was seen by Lawrence Conley, D.O., of the Missouri Delta Medical Center with complaints of bilateral carpal tunnel syndrome. (Tr. 262). X-rays of Stewart's wrists showed significant arthritic changes. (Tr. 263). Dr. Conley noted no musculoskeletal pain, instability or stiffness. (Tr. 273).

On March 21, 2012, Stewart was seen that the Smith Street Clinic because of anxiety and panic attacks, after having gone to urgent care previously that week. (Tr. 278). Stewart was prescribed Xanax as needed. (Tr. 278). The physician noted normal walking gait. (Tr. 279).

On April 5, 2012, Dr. Henderson wrote a letter to Dr. Campbell regarding Stewart for a surgical consultation. (Tr. 323-24). Dr. Henderson did a CT of the thorax that showed scattered right lymph nodes and nodular densities that merited further follow up. (Tr. 280). Stewart was

8

diagnosed with a Marjolin's ulcer, which was consistent with squamous cell carcinoma rising in an old burn wound. On April 20, 2012, Stewart underwent an excision of the right proximal forearm of the squamous cell carcinoma by Dr. Henderson. (Tr. 322).

On May 16, 2012, Stewart was seen at the Smith Street Clinic with complaints of stiffness, sadness and anxiety, but he thought those problems were controlled with Celexa. (Tr. 400). The physician noted normal walking gait observed. (Tr. 401).

On August 1, 2012, Stewart was seen at the Smith Street Clinic again with complaints of stiffness, fatigue, and anxiety. (Tr. 398). The physician noted normal walking gait observed. (Tr. 399).

On September 12, 2012, Stewart was seen for an x-ray of his right shoulder, which showed no acute fracture. (Tr. 406).

On September 18, 2012, Stewart was seen at the Missouri Delta Medical Center emergency room after falling off of a ladder. (Tr. 384-88). He complained of pain in his right shoulder, and the doctor sent him for an MRI. (Tr. 386). On September 28, 2012, Dr. Campbell again ordered Stewart to obtain an MRI when Stewart appeared wearing a sling. (Tr. 396).

On September 25, 2012, Stewart was seen at Smith Street Clinic. (Tr. 397). The physician observed that Stewart walked with a normal gait.

On October 23, 2012, Stewart had an MRI, which showed fluid surrounding the proximal portion of the biceps tendon, which could indicate biceps tendinopathy. (Tr. 446).

On December 5, 2012, Stewart was seen by Dr. Conley complaining of right shoulder pain after his fall in June 2012. (Tr. 419). Stewart was diagnosed with impingement, right shoulder, with biceps tendinitis. (Tr. 419-20). Dr. Conley gave Stewart an injection of Kenalog and lidocaine and ordered physical therapy. (Tr. 419).

9

On January 4, 2013, Stewart was seen by Dr. Conley and diagnosed with impingement syndrome of the right shoulder, which was symptomatically improving. (Tr. 417). Dr. Conley said he would keep an eye on it. On January 22, 2013, Stewart was seen at the Smith Street Clinic with reports for decreased range of motion at the right shoulder. (Tr. 484-85). Stewart was ordered to continue his medications as instructed. The physician noted normal walking gait observed, but decreased range of motion. (Tr. 485). On March 13, 2013, Stewart again complained of right arm decreased range of motion. (Tr. 483).

On March 18, 2013, Stewart was seen at the Smith Street Clinic. (Tr. 483). The physician noted normal walking gait observed and right arm weakness. (Tr. 483).

On March 27, 2013, Stewart was seen by Dr. Conley for a follow-up regarding his shoulder. (Tr. 415). Dr. Conley noted no joint pain, instability, or swelling. (Tr. 415). Stewart indicated he wanted to proceed with surgery. (Tr. 416). On April 25, 2013, Stewart canceled his surgery due to his "financial situation" and said he would reschedule when he hae more money for physical therapy. (Tr. 423).

On June 18, 2013, Stewart was seen at the Smith Street Clinic with reports of back and right shoulder pain, as well as anxiety and depression. (Tr. 480-81). The physician noted normal walking gait observed, but noted decreased range of motion in the right shoulder. (Tr. 481). Stewart's medications were refilled.

On August 21, 2013, Stewart reported stiffness, weakness, and lumbar pain at his appointment with the Smith Street Clinic. (Tr. 478). The physician noted normal walking gait observed. (Tr. 479). Stewart's medications were refilled.

On October 2, 2013, Stewart was seen at the Smith Street Clinic. (Tr. 477). The physician noted pain with flexion on left wrist with mild edema but no other musculoskeletal issues. (Tr. 477).

On December 29, 2013, Stewart was seen at the Missouri Delta Medical Center with complaints of lower back pain radiating into his left leg. (Tr. 425-26). He rated the pain as an eight out of ten. (Tr. 426). Stewart had paravertebral tenderness and was weaker on the left side. (Tr. 435).

On January 6, 2014, Stewart as seen at Smith Street Clinic for decreased range of motion and a slow and stiff gait. (Tr. 474-75).

On February 10, 2014, Stewart had an x-ray of his lumbar spine. (Tr. 472). The findings were: "Lumbar vertebra are normal alignment and height. Mild mid lumbar dextroscoliosis at least 8 degrees is seen. Mild disc narrowing is seen L4-5 and L5-S1." (Tr. 472).

On February 10, 2014, Dr. Campbell provided a Medical Source Statement-Physical. (Tr. 450-51). Dr. Campbell said that Stewart could lift or carry less than 5 pounds; he could stand or walk less than 15 minutes; sit continuously 15 minutes and sit throughout the day less than an hour; limited pushing and pulling due to his low back pain. Stewart could never climb, balance, stoop, kneel, crouch, crawl and could occasionally reach, handle and finger. Dr. Campbell said Stewart needed a four-prong cane for balance and ambulation and needed to lie down every 15 minutes for 2-5 minutes. Dr. Campbell also filled out a Medical Source Statement-Mental. (Tr. 452). Dr. Campbell said that Stewart was extremely limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Stewart was markedly limited in his ability to set realistic goals or make plans independently of others. (Tr. 452-53).

11

## IV.  Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.*  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove

---

[2] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

[t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V.   Discussion

The ALJ concluded that Stewart could perform light work with frequent reaching, handling, and fingering, and occasional reaching overhead with the right upper extremity. (Tr. 15). The ALJ also limited Stewart to unskilled work. (Tr. 15). The ALJ also acknowledged that there was no assessment of Stewart's physical limitations from a State agency medical

14

consultant. (Tr. 18). The ALJ afforded Dr. Campbell's medical source opinion only "minimal weight." (Tr. 18). The ALJ stated,

> minimal weight is given to Dr. Campbell's opinions on these issues because his opined limitations are grossly overstated when compared to his own treatment records, as well as with the evidence of record as a whole. In fact, the exertional limitations opined by Dr. Campbell are much more limiting than the claimant himself alleged throughout his testimony at the hearing.

(Tr. 18).

Stewart asserts that the ALJ erred by failing to provide an RFC supported by substantial evidence. Stewart argues that the ALJ discounted the treating physician Dr. Campbell's opinion without providing good reasons and failed to identify "some" medical evidence to support the RFC determination. (Tr. 11 at 7). Stewart claims that remand is required because the ALJ failed to provide good reasons for discounting Dr. Campbell's opinion and then failed to support the RFC with "some" evidence. (ECF No. 11 at 7). Stewart notes that a treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence.*" (ECF No. 11 at 7 (citing *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (emphasis in original)). Stewart claims that (1) the ALJ does not explain how Dr. Campbell's opinion is inconsistent with substantial evidence in the record so as not to deserve controlling weight, and (2) even if the ALJ did properly determine that Dr. Campbell's opinion did not deserve controlling weight, the ALJ did not discuss the factors required by the regulations or provide "good reasons" for the weight he assigned to the opinion. (ECF No. 11 at 8-9). Stewart claims that Dr. Campbell's treatment notes are consistent with her opinion that Stewart was limited to less than sedentary work, required a cane, and could only occasionally manipulate. (ECF No. 11 at 9). Stewart points to Dr. Campbell's treatment notes that showed a decreased

15

range of motion of the right shoulder, decreased grip strength, decreased range of motion of the bank, and a slow, stiff gait. (ECF No. 11 at 9). Stewart also notes that no other physician provided an opinion of Stewart's functioning. (ECF No. 11 at 9). Stewart maintains that he was diagnosed with decreased range of motion in the right shoulder and decreased grip on the right, as well as tenderness, positive straight leg raises and weakness on the left side. (ECF No. 11 at 9). Stewart claims that this is consistent with Dr. Campbell's opinion that Stewart's ability to push and/or pull was limited by his low back pain and weakness in his left lower extremity. (ECF No. 11 at 9). Stewart also notes that two physicians believed that Stewart's impairments required surgery. (ECF No. 11 at 9-10).

Stewart also claims that, even if the ALJ had properly concluded the Dr. Campbell's opinion did not deserve controlling weight, remand is still required because the ALJ failed to provide any other reason for discounting Dr. Campbell's opinion other than citing to Stewart's own testimony. (ECF No. 11 at 10).

Moreover, Stewart asserts that the ALJ should have concluded that Dr. Campbell's opinions deserved deference because of Dr. Campbell's duration of treatment of Stewart. (ECF No. 11 at 11 citing 28 C.F.R. §416.927(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). Stewart notes that Dr. Campbell treated him for about two years when she provided her opinion in 2014. (ECF No. 11 at 11). Stewart claims that Dr. Campbell provided

treatment records documenting abnormal findings, prescribed medications, and referred Stewart to other specialties as necessary. (ECF No. 11 at 11).

Finally, Stewart contends that, even if the ALJ did properly consider and afford Dr. Campbell's opinion minimal weight, remand is still required because the record contains no other evidence regarding Stewart's functional limitations. (ECF No. 11 at 12). Rather, the records show that Stewart had decreased range of motion of the right shoulder and back, decreased grip strength, and lower extremity weakness. (ECF No. 11 at 12). Stewart notes his carpal tunnel syndrome, right shoulder impingement, severe shoulder pain, and his testimony that he would be unable to lift 20 pounds five days a week. (ECF No. 11 at 14). Stewart argues that the record does not contain any evidence that other than Dr. Campbell's opinion explaining how these findings and impairments impact Stewart's functioning. (ECF No. 11 at 12). Stewart maintains that because the ALJ failed to support the RFC assessment with "some medical evidence," remand is required. (ECF No. 11 at 12-13 (citing *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000); *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001)). Stewart argues that the ALJ's RFC is not supported by substantial evidence because the medical evidence suggests greater limitations in Stewart's ability to lift than concluded by the ALJ. (ECF No. 11 at 14).

The Court holds that the ALJ's decision is supported by substantial evidence. First, the Court finds that the ALJ properly found that Dr. Campbell's opinion was inconsistent with the evidence as a whole, including her own treatment notes. (Tr. 18). For example, Dr. Campbell indicated on her medical evaluation that Stewart needed to use a cane. (Tr. 452). However, the ALJ pointed out that the evidence in the record did not support that a cane was medically necessary. (Tr. 20). In fact, Dr. Campbell consistently noted that Stewart had a normal walking gait. (Tr. 279, 395, 397, 399, 401, 477, 481, 483, 485). Other treatment providers also revealed

17

that Stewart had a steady gait. (Tr. 262, 273, 415). Stewart denied needing a cane at various appointments and in his Function Report. (Tr. 414, 418, 421, 205). Dr. Campbell's treatment notes also do not reflect that she ever prescribed a cane for Stewart. (Tr. 20, 278-81, 394-412, 474-85).

The medical evidence also contradicted Dr. Campbell's opinion that Stewart's back impairment limited him to sitting for less than one hour and walking or standing for less than one hour in an eight-hour day. (Tr. 33, 450). The ALJ noted that a February 2014 x-ray revealed only mild disc narrowing in Stewart's spine. (Tr. 18-19, 472). Examinations of Stewart's back were often normal. (Tr. 244, 287, 395, 401, 483, 485). Stewart's mild diagnostic test results and relatively normal physical examinations did not support the extreme sitting and standing/walking limitations contained in Dr. Campbell's opinion. (ECF No. 16 at 6 (citing *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (mild degenerative changes in claimant's back did not support a finding of disability); *Hageman v. Colvin*, No. 2:13CV79 NCC, 2014 WL 4912564, at *16 (E.D. Mo. Sept. 30, 2014) (diagnostic testing showing only mild or minor conditions inconsistent with a finding of disability).

In addition, Dr. Campbell's treatment notes do not reflect that she ever recommended that Stewart limit his sitting and standing or walking to the degree reflected in her opinion. (Tr. 16 at 7). The ALJ could discredit Dr. Campbell's opinion about Stewart's restrictions when they did not appear in her treatment notes. *See Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (the ALJ was within his discretion, based upon the record, to discredit the claimant's subjective complaints of pain and find that the claimant did not have the ability to perform the full range of sedentary work); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (discrediting a treating

18

physician's opinion because none of the restrictions appeared elsewhere in the treatment records).

Furthermore, the medical evidence did not support Dr. Campbell's opinion that Stewart could only occasionally reach, without regarding to the direction of reaching or the arm involved. (Tr. 451). Even after Stewart injured his shoulder falling off of a ladder, Stewart could still extend his right arm 90 degrees or to shoulder level. (Tr. 18-19, 33, 385, 415-16). Thus, Stewart's decreased range of motion affected his ability to reach overhead, not his ability to reach in all directions as Dr. Campbell indicated. (Tr. 15). And, there was no evidence that Stewart was limited to only occasional reaching with his left arm. (Tr. 15).

Similarly, the medical evidence did not support Dr. Campbell's opinion that Stewart was limited to only occasional handling and fingering. (Tr. 451). A December 2011 examination showed that Stewart had full grip strength on the left and nearly full grip strength on his right; normal range of motion in his wrists; and no tenderness to palpation over the metacarpal, carpal or distal forearm. (Tr. 262-63). At the hearing, Stewart had trouble remembering which wrist was purportedly the worse wrist. (Tr. 38, 262-63).

The ALJ found it significant that Dr. Campbell's opinion was more limiting than Stewart's testimony about his restrictions. (Tr. 18). For example, Dr. Campbell opined that Stewart could lift less than five pounds occasionally, but Stewart testified that he could lift eight pounds every day and even lift 20 pounds. (Tr. 37, 42, 450). Dr. Campbell indicated that Stewart could walk continuously for less than 15 minutes but Stewart said he could walk for 15 to 20 minutes. (Tr. 450). Stewart did not identify any limitations using his left arm, but Dr. Campbell limited Plaintiff to reaching only occasionally with either arm. (Tr. 451). Further, the ALJ believed the Stewart's daily activities demonstrated that he could perform light work.

Stewart was able to take care of his personal needs, shop, perform various household chores, prepare meals, and occasionally worked ten hours per week. (Tr. 20, 32-33, 36, 63, 66, 199-202, 385). Stewart's activities were greater than would be expected from someone with the limitations outlined by Dr. Campbell. (ECF No. 16 at 9).

Likewise, the Court holds that Stewart has overstated his claims that Dr. Campbell's opinion was consistent with her treatment notes. The clinical findings from the record do not support the extreme limitations in Dr. Campbell's opinion. For example, Stewart cites two treatment records where he had decreased range of motion in his back (Tr. 475, 481), but Stewart fails to explain how simply having decreased range of motion supports Dr. Campbell's opinion that Stewart was limited to sitting for less than one hour in an eight-hour workday and standing or walking less than one hour in an eight-hour workday. (ECF No. 16 at 9).

In addition, Stewart's arguments fail to consider the medical record as a whole. Rather, Stewart relies on isolated clinical findings regarding a reduced range of motion in his back and slow, stiff gait. (ECF No. 11 at 9, 14 (citing Tr. 435-38, 474-75)). Stewart, however, ignores that these symptoms occurred after he had strained his back while "lifting some things" (Tr. 435-38, 474-75). As previously noted, the majority of Stewart's back examinations were normal, and a February 2014 x-ray revealed only mild disc narrowing in his back. (Tr. 18-19, 244, 395, 401, 472, 483, 485). Likewise, Stewart generally displayed a normal gait. (Tr. 262, 273, 279, 395, 397, 399, 401, 415, 477, 479, 481, 483, 485). Thus, the Court holds that the clinical findings relied upon by Stewart were the result of an acute injury, rather than a permanent ongoing condition. The Court agrees with the ALJ that these few records are insufficient to overcome the totality of the record related to Stewart's abilities.

20

Further, the Court holds that the ALJ articulated "good reasons" for the weight he gave Dr. Campbell's opinion. 20 C.F.R. §416.927(c)(2). The mere fact that the ALJ did not discuss in depth every factor in 20 C.F.R. §416.927(c) is not sufficient for remand. *See Bense v. Colvin*, No. 4:14CV890NCC, 2015 WL 5675238, at \*4 (E.D. Mo. Sept. 25, 2015) (the ALJ need not explicitly discuss each factor).

Finally, the Court, in keeping with Eighth Circuit precedent, holds that the ALJ is not required to reply upon a specific medical opinion to have his opinion supported by medical evidence. "An RFC is a medical question, and the ALJ's determination of a claimant's RFC 'must be supported by some medical evidence of the claimant's ability to function in the workplace.'" *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008) (internal citation omitted). "[A] lack of medical evidence *to support a doctor's opinion* does not equate to underdevelopment of the record as to a claimant's disability, as 'the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.'" *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Schmidt v. Astrue,* 496 F.3d 833, 845 (7th Cir. 2007)). Although the RFC must be supported by "some medical evidence," such evidence does not need to include a medical opinion. *See Lockwood v. Colvin*, 627 F. App'x 575, 577 (8th Cir. 2015) (citing *Cox v. Astrue,* 495 F.3d 614, 619–20 (8th Cir. 2007) ("in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively.... Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."). The Court holds that the objective medical evidence, as well as Stewart's testimony, are sufficient to constitute substantial medical evidence to support the RFC. *See Flynn v. Astrue*, 513 F.3d 788, 794 (8th

Cir. 2008). The record is replete with objective findings from Stewart's physical examinations, mild diagnostic test results, and Stewart's conservative course of treatment that support the RFC.

Thus, the Court holds that the ALJ properly gave only minimal weight to Dr. Campbell's opinion and that the RFC is supported by substantial evidence.

## VI. Conclusion

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 26th day of January, 2017.

RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE